

**FILED & ENTERED**

**AUG 07 2018**

**CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Wendy Tejeda, Debtor | Case No.:    2:17-bk-10155-ER<br>Adv. No.:    2:17-ap-01308-ER |
| Sorayda Velasquez,<br><br>                                    Plaintiff<br><br>           v.<br><br>Wendy Tejeda,<br><br>                                    Defendant | **MEMORANDUM OF DECISION FINDING THAT TEJEDA'S INDEBTEDNESS TO VELASQUEZ, IN THE AMOUNT OF $28,000.00, IS EXCEPTED FROM DISCHARGE** |
| | **TRIAL:**<br>Date:       May 1, 2018<br>Time:      9:00 a.m.<br>Location: Ctrm. 1568<br>                Roybal Federal Building<br>                255 East Temple Street<br>                Los Angeles, CA 90012 |

## I. Introduction[1]

    In this dischargeability action, Sorayda Velasquez ("Velasquez") alleges that Wendy Tejeda ("Tejeda"), her landlord, caused Velasquez's water service to be disconnected to induce Velasquez to vacate her apartment. Velasquez alleges that the absence of water service rendered the apartment untenable, in breach of the implied warranty of habitability. Velasquez alleges that

---
[1] This disposition is not appropriate for publication.

the damages she suffered in connection with Tejeda's breach of her obligations as a landlord are non-dischargeable pursuant to §523(a)(6).

Trial was conducted on May 1, 2018. The Court ordered Velasquez to file a transcript of the trial proceedings by June 8, 2018.[2] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[3] For the reasons set forth below, the Court finds that Tejeda is indebted to Velasquez in the amount of $28,000.00, and that such indebtedness is excepted from discharge pursuant to §523(a)(6).

## II. Pretrial Proceedings

Prior to taking testimony, the Court adjudicated two Motions *in Limine* brought by Velasquez and one Motion *in Limine* brought by Tejeda. The Court made its tentative rulings on all three Motions *in Limine* available to the parties prior to the trial date. Neither Velasquez nor Tejeda presented any oral argument in opposition to the tentative rulings. The Court adopts its tentative rulings on the Motions *in Limine* as its final rulings. Those rulings are incorporated herein by reference as though set forth in full.

Specifically, the Court granted Velasquez's First Motion *in Limine*, which sought to preclude Tejeda from asserting that she was not bound by the terms of a written lease agreement, solely on the basis that the lease had been executed by Tejeda's ex-husband, rather than by Tejeda.[4] However, in granting Velasquez's First Motion *in Limine*, the Court noted that Tejeda had not taken the position that she was not bound by the lease because it was executed by her ex-husband.[5] Rather, the Court observed, Tejeda's position was that the lease presented by Velasquez was a forgery.[6]

The Court denied Velasquez's Second Motion *in Limine*, which sought to prelude Tejeda from asserting that she did not have control over the water utility account used to furnish water to Velasquez's apartment.[7] The Court found that Velasquez's Second Motion *in Limine* presupposed that Tejeda, in her capacity as landlord, owed Velasquez a duty to furnish water to Velasquez's apartment. The Court stated that such a presupposition was improper, because the Pretrial Order specified that the authenticity of the lease proffered by Velasquez remained at issue.[8] The Court further found that the issue of who controlled the water account was relevant to

---

[2] The transcript is available as Doc. No. 59 and is cited as "Tr." However, the most complete record of the proceedings is the audio recording on file with the Clerk of the Court. The transcript is of limited utility because key portions of the testimony are rendered as "indiscernible." Where necessary, citations to the transcript quoted herein have been supplemented by the Court based upon the audio record. In addition, the Court has corrected misspellings of the names of various parties. Specifically, the transcript's references to "Alana Ruiz" have been corrected to "Elena Ruiz"; references to "Alejandra Eslas" have been corrected to "Alejandra Islas"; and references to "Shannon Salkamura" have been corrected to "Shannon Sathkimana."
[3] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§101–1532.
[4] *See generally* Final Ruling Granting Velasquez's First Motion *in Limine* [Doc. No. 51].
[5] *Id.* at p. 5.
[6] *Id.*
[7] *See generally* Final Ruling Denying Velasquez's Second Motion *in Limine* [Doc. No. 52].
[8] *Id.* at p. 7.

assessing whether Tejeda's alleged termination of water service was "willful" and "malicious" within the meaning of §523(a)(6).[9]

The Court granted Tejeda's Motion *in Limine* to preclude Velasquez from presenting any issues or evidence not set forth in the Pretrial Order.[10]

## III. Credibility Determinations

Velasquez and Tejeda were the only witnesses who testified at trial,[11] and their testimony differed in material respects, as detailed below. In resolving disputed issues of fact, the Court finds Velasquez's testimony to be more credible than Tejeda's. Velasquez's testimony was direct, clear, and consistent. She did not contradict herself on cross-examination. Her testimony was detailed but did not appear to be the product of rehearsal or coaching.

By contrast, Tejeda implausibly claimed that she could not remember significant facts. Tejeda is a licensed realtor.[12] She has worked for Century 21 since September 2016, but has worked in real estate prior to 2016.[13] In addition to the five-unit rental property at issue here (the "Property"),[14] Tejeda has previously owned rental property in Arizona. Tejeda testified that she managed the Property with her former husband and executed a written lease agreement with Velasquez.[15] Notwithstanding her experience selling and managing real estate, Tejeda claimed that she did not know or could not remember key details regarding the Property. She could not remember or even estimate what the monthly mortgage payments on the Property were.[16] She testified that certain tenants were responsible for paying for their own utilities while others were not, but could not remember how she decided which tenants would be required to pay for their own utilities.[17] She did not know how many of the five units at the Property were individually metered for gas.[18] She could not remember how much rental income she earned on her Arizona rental property in 2013.[19] She could not remember whether she first listed the Property for sale in 2012, 2013, 2014, or a different year,[20] notwithstanding her testimony that the Property was the source of serious financial strain.[21] She testified that she was not aware that she could have sold the Property at a loss to someone who had the financial ability to restore water service:

> **Question (by Velasquez's counsel):** Did you ever try to sell the property maybe for a significant loss to a person or entity that would turn the water back on?

---

[9] *Id.* at pp. 7–8.
[10] *See generally* Final Ruling Granting Tejeda's Motion *in Limine* [Doc. No. 53].
[11] Velasquez issued a subpoena upon Shannon Sathkimana, a health investigator, requiring Ms. Sathkimana to appear at the trial and testify. Ms. Sathkimana failed to appear. Tr. at 5:1–16. Tejeda issued a subpoena to the custodian of records for Golden State Water Company. The custodian also failed to appear. *Id*. at 116:11–16.
[12] Tr. at 137:21–25 (Tejeda's testimony).
[13] *Id*. at 182:8–19 (Tejeda's testimony).
[14] The Property is located at 1136–1138 E. 81st Street, Los Angeles, California. Pretrial Order at ¶1(c) [Doc. No. 35].
[15] Tr. at 102:6–104:2 (Tejeda's testimony that she executed a written lease agreement with Velasquez); Tr. at 130:18–24 (Tejeda's testimony that she and her former husband were both responsible for managing the Property).
[16] *Id*. at 141:6–10 (Tejeda's testimony).
[17] *Id*. at 150:9–16 (Tejeda's testimony).
[18] *Id*. at 151:10–15 (Tejeda's testimony).
[19] *Id*. at 156:9–13 (Tejeda's testimony).
[20] *Id*. at 181:7–15 (Tejeda's testimony).
[21] *Id*. at 111:10–11 (Tejeda's testimony that the Property became a financial burden after the tenants stopped paying rent).

**Answer:** I didn't know you could do that.

Tr. at 182:4–7.

This testimony is especially damaging to Tejeda's credibility. It is impossible for the Court to fathom how a real estate professional working in California subsequent to the property crash that occurred during the Great Recession of 2008–09 could not be aware that it was possible to sell real estate at a loss.

Even more damaging to Tejeda's credibility was her claim that between approximately February 2013 and December 2014, she was not aware that any tenants were still living at the Property, which she owned.[22] As an explanation for this remarkable claim, Tejeda testified that she was afraid to visit the Property because two of the tenants, Elena and Ignacio Ruiz, had threatened to kill her.[23] Notwithstanding her fear of Elena and Ignacio Ruiz, it is not believable that Tejeda could have been completely unaware that tenants were living at the income-producing Property for approximately eighteen months. Testimony at trial established that Tejeda regularly communicated with tenant Velasquez by telephone.[24] Tejeda could have communicated with the other tenants by telephone as well. Tejeda also testified that she directed her father to serve eviction paperwork upon Elena and Ignacio Ruiz.[25] Tejeda could have used her father, or some other trusted representative, to ascertain the status of the tenants at the Property. Even simply driving past the Property could have revealed whether it was still occupied. In sum, Tejeda's claims of ignorance regarding the Property are not believable, and such claims seriously undermine the plausibility of the remainder of Tejeda's testimony.

## IV. Findings of Fact and Conclusions of Law

*A. The Rental Agreement*

In September 2012, Velasquez moved into a two-bedroom apartment at the Property.[26] Velasquez rented the apartment from Tejeda and Tejeda's former husband, Rodolfo Tejeda.[27] Under the rental agreement, Velasquez was a month-to-month tenant.[28] Her initial monthly rent was $975, which included gas, electric, and water utilities.[29] Tejeda's former husband was not meaningfully involved in the negotiation of the rental agreement; Velasquez negotiated the terms of the agreement primarily with Tejeda.[30]

The rental agreement was never reduced to writing. At the time the parties negotiated the rental agreement, Tejeda presented Velasquez with a document captioned *Residential Lease or Month-to-Month Rental Agreement* (Plaintiff's Ex. 1) (the "Purported Lease"). Velasquez did not sign the Purported Lease and did not sign any other written rental agreement.[31] The terms set

---

[22] *Id.* at 160:14–163:21. Tejeda did not precisely specify the exact beginning of the time period during which she claimed to have believed that no tenants were living at the Property. The Court uses February 2013 as the start of the time period, based upon Tejeda's November 23, 2016 deposition testimony that she had hoped the tenants would move out of the Property by no later than February 2013. Tejeda Nov. 23, 2016 Deposition at 73:22–74:9.
[23] *Id.* at 125:6–10 (Tejeda's testimony).
[24] *Id.* at 18:6–14, 23:13–22, and 25:6–12 (Velasquez's testimony).
[25] *Id.* at 133:6–134:1 (Tejeda's testimony).
[26] *Id.* at 8:13–20 (Velasquez's testimony).
[27] *Id.* at 8:17–16:13 (Velasquez's testimony); *id.* at 102:6–11 (Tejeda's testimony).
[28] *Id.* at 103:23–104:2 (Tejeda's testimony).
[29] *Id.* at 16:16–19 (Velasquez's testimony).
[30] *Id.* at 14:15–16:13 (Velasquez's description of her negotiation of rental terms with Tejeda).
[31] *Id.* at 51:8–10 (Velasquez's testimony).

forth in the Purported Lease are inconsistent with the terms of the rental agreement that the parties negotiated. For example, the Purported Lease provides for monthly rent of $653—not the monthly rent of $975 that the parties agreed upon. The discrepancy resulted from the fact that Velasquez could not afford to move into the apartment unless she received a one-time public-assistance payment.[32] The maximum payment Velasquez was entitled to receive was $653.[33] To receive the payment, Velasquez was required to present a written lease agreement to her social worker.[34] However, Velasquez was eligible to receive the payment only if the lease agreement reflected that her monthly rent was $653 or less.[35] To enable Velasquez to receive the public assistance payment, Tejeda filled out the Purported Lease using the $653 monthly rental figure, even though that figure did not reflect the actual rent of $975 which the parties had agreed upon.[36]

Under California law, Velasquez's tenancy is governed by the terms that the parties actually negotiated, not the inaccurate terms set forth in the Purported Lease. The Purported Lease is not binding because it was not signed by Velasquez and does not reflect the actual rental agreement of the parties. *See* Cal. Civ. Code §§1550 and 1565 (a contract does not exist unless the parties mutually consent to its terms). Velasquez could not have assented to the terms of the Purported Lease because the document is in English and Velasquez cannot read written English.[37] Velasquez negotiated the rental terms with Tejeda in Spanish.[38]

For approximately the first year of her tenancy, Velasquez paid Tejeda monthly rent of $975 in cash.[39] Tejeda's acceptance of the rent created a month-to-month tenancy. *See* Cal. Civ. Code §1946; *Getz v. City of W. Hollywood*, 233 Cal. App. 3d 625, 629, 284 Cal. Rptr. 631, 633 (Ct. App. 1991) ("A tenancy may be created without a formal agreement, by consent and acceptance of rent."); *Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.*, 98 Cal. App. 4th 345, 352, 119 Cal. Rptr. 2d 741, 744–45 (2002), as modified (May 9, 2002) (same).

### B. Disconnection of Velasquez's Electrical and Gas Service

Approximately one year after moving into the apartment, the electricity to Velasquez's apartment was disconnected.[40] Velasquez immediately telephoned Tejeda to find out why.[41] Tejeda informed Velasquez that Tejeda had disconnected the electrical service to the Property because one of the tenants was no longer paying rent.[42] After Velasquez protested, Tejeda informed Velasquez that she had no intention of reconnecting electrical service, and that if Velasquez was unhappy with this arrangement, she should move somewhere else.[43]

---

[32] *Id*. at 10:21–25 (Velasquez's testimony that she needed to move because of an unspecified "grave emergency," but could not afford to do so without public assistance).
[33] *Id*. at 14:1–14 (Velasquez's testimony).
[34] *Id*. at 14:21–15:11 (Velasquez's testimony).
[35] *Id*. at 14:23–15:6 (Velasquez's testimony).
[36] *Id*. at 10:16–16:5 (Velasquez's testimony).
[37] *Id*. at 54:12–15, 57:1–9 (Velasquez's testimony).
[38] *Id*. at 54:16–22 (Velasquez's testimony).
[39] *Id*. at 16:20–17:3 (Velasquez's testimony that Tejeda would come to her apartment every month to collect the rent, and that Velasquez would pay the rent in cash).
[40] *Id.* at 17:9–17 (Velasquez's testimony).
[41] *Id.* at 18:6–14 (Velasquez's testimony).
[42] *Id.* at 18:18–19:16 (Velasquez's testimony).
[43] *Id.*

Velasquez arranged for the electric utilities for the Property to be placed in her name.[44] Because the five rental units at the Property were not individually metered, Velasquez was required to assume the electricity bill for the entire complex.[45] Velasquez was not pleased with this arrangement, but felt that she had no choice.[46] Velasquez never received any reimbursement from the other tenants for their share of the electricity.[47] Velasquez was too afraid of the other tenants to ask them to pay their *pro rata* share of the electric bill.[48]

The next time that Tejeda came to collect Velasquez's monthly rental payment, Tejeda agreed to reduce Velasquez's rent from $975 per month to $875 per month, on account of the fact that Velasquez had assumed responsibility for the electrical bill.[49] Velasquez protested this arrangement, because the monthly electrical bill for the entire Property exceeded the $100 rent reduction.[50] Velasquez acquiesced to the new rental terms and paid Tejeda the $875 in rent only because she could not afford to relocate to a new apartment and felt she had no other choice.[51]

Several months later, Tejeda disconnected the gas to Velasquez's apartment.[52] When Velasquez called to complain, Tejeda told Velasquez that she should arrange for the gas service to be placed in her name, just as she had done with the electric service.[53] Tejeda told Velasquez that if she did not want to do this, she should find a new apartment.[54] Velasquez was not pleased, but had the gas utilities placed in her name because she felt she had no other choice.[55] Tejeda did not reduce Velasquez's rent after the gas service was disconnected.[56]

*C. Disconnection of Velasquez's Water Service*

In December 2014, the water service to Velasquez's apartment was disconnected. Once again, Velasquez telephoned Tejeda for an explanation. Tejeda told Velasquez that she was not going to take any action to reconnect the water service. Tejeda blamed the disconnection on the fact that another tenant was not paying rent. Tejeda told Velasquez that she needed to find a new place to live:

> **Question (by Velasquez's counsel):** Did she have any response to you about the water utility?
> **Answer (by Velasquez):** She just told me the same. She said that she didn't want the property, that she understood everything but that she, please leave—leave there. Everybody leave. I—she told me truthfully, "I have so many problems and I'm not going to be resolving the problems of everybody else," and I told her, I said—I tried to make her understand that the water was vital for me, that—well, nobody can live without water. In other words, I told her that I need it and she said, "No, Sorayda [Velasquez], I have been telling you for a time to go find some other place to live. I don't know why you

---

[44] *Id.* at
[45] *Id.* at 21:10–20 (Velasquez's testimony).
[46] *Id.* at 21:21–22:3 (Velasquez's testimony).
[47] *Id.* at 24:1–3 (Velasquez's testimony).
[48] *Id.*
[49] *Id.* at 20:10–21:6 (Velasquez's testimony).
[50] *Id.* at 20:21–21:20 (Velasquez's testimony).
[51] *Id.* at 21:21–22:3 (Velasquez's testimony).
[52] *Id.* at 22:14–23:22 (Velasquez's testimony).
[53] *Id.* at 23:13–22 (Velasquez's testimony).
[54] *Id.*
[55] *Id.* at 23:1–22 (Velasquez's testimony).
[56] *Id.* at 23:13–15 (Velasquez's testimony).

> keep insisting on staying if you know what's going on there, that those people are not wanting to pay me."

Tr. at 25:20–26:9.

When Velasquez protested and demanded that Tejeda take action to restore water service, Tejeda responded that she was not required to restore water because she owned the Property:

> **Question (by Tejeda's counsel):** You asked you—you didn't ask her why she shut off the water?
> **Answer (by Velasquez):** I didn't ask her why. I asked her that I wanted water.
> **Question:** Okay.
> **Answer:** And that she was the owner of the house and that she couldn't do that.
> **Question:** Why?
> **Answer:** And she said, "Of course I can do that," she said, "because that's my property, that's my housing. If you don't feel good there, I've been telling you for a while that it's better that you leave."

Tr. at 67:6–17.

Water service to the Property had been provided by Golden State Water Company ("GSWC").[57] The five units at the Property were not individually metered for water service; instead, there was one master water meter covering the entire Property.[58] The water account for the Property was in Tejeda's name, and Tejeda paid for the Property's water service, through February 2013.[59] Tejeda closed her account with GSWC in February 2013.[60] After February 2013, Alejandra Islas, another tenant living at the Property, assumed responsibility for the Property's water utility account.[61] Because Islas had taken over the water account, there was no interruption to water service to the Property in February 2013, at the time Tejeda closed her account.[62]

In late December 2014 or early January 2015, Velasquez contacted Strategic Actions for a Just Economy (SAJE) for assistance in having water service to her apartment restored.[63] SAJE informed the Los Angeles County Department of Health (the "Health Department") about the absence of water at the Property.[64] On January 9, 2015, the Health Department conducted a hearing regarding the Property's lack of water service.[65] Velasquez, Tejeda, and several other tenants attended the January 9 hearing (the "Jan. 2015 Hearing"). At the Hearing, Chief Environmental Health Specialist Fahrudin Dean Zulcic ordered Tejeda to immediately restore water service to the Property.[66] Tejeda did not agree to restore water service, and instead told

---

[57] *Id.* at 109:6–8 (Tejeda's testimony).
[58] *Id.* at 108:23–109:1 (Tejeda's testimony).
[59] *Id.* at 110:2–5 (Tejeda's testimony).
[60] *Id.*
[61] *Id.* at 113:9–14 (Tejeda's testimony).
[62] *Id.* at 117:19–118:1 (Tejeda's testimony).
[63] *Id.* at 27:10–28:8 (Velasquez's testimony).
[64] *Id.* at 30:5–18 (Velasquez's testimony).
[65] Pretrial Order at ¶1(g)–(h).
[66] *Id.* at ¶1(h).

Zulcic that she was willing to pay any fines assessed as a result of the absence of water.[67] Tejeda further stated that she wanted the tenants living at the Property to leave.[68]

Immediately after the Jan. 2015 Hearing, Velasquez asked Tejeda to reconnect the water service. Velasquez described the conversation as follows:

> I went to go pick up my children where they were being taken care of and when I went down to the parking lot I found her there and I begged her again. I told her, "Wendy [Tejeda], take out—take out the people that are not paying you. I don't have problems to pay you. Connect the water. Evict the people there that are not paying you. You're the owner." And she didn't say anything to me. She just said, "You should leave, Sorayda [Velasquez], because I already called the social workers and they're going to take your kids away."

Tr. at 34:6–14.

Tejeda testified that she contacted the Department of Children and Family Services ("DCFS") only because a Health Department official had instructed her that she was required to inform DCFS that there was no running water at the Property.[69] Tejeda denied that she was motivated in any way by a desire to harm or threaten Velasquez.[70] The Court does not doubt that the Health Department official's directive was one of the reasons that Tejeda contacted DCFS. However, the Court finds that Tejeda was also motivated by a desire to intimidate Velasquez into moving out of her apartment. The Court finds that Tejeda wanted Velasquez and the other tenants to move out of the Property to make it easier for Tejeda to dispose of her interest in the Property. When asked on cross-examination why she had agreed to meet with Velasquez at SAJE after the Hearing, Tejeda started to say that she thought SAJE would help Velasquez and her children relocate, before responding "I don't know":

> **Question (by Velasquez's counsel):** How did you think they [SAJE] would help?
> **Answer:** Re—help them [Velasquez and her children] relo—I don't know. Help them help me. I was going through hardship.

Tr. at 177:25–178:2.

In deposition testimony given on November 23, 2016, Tejeda stated that she had informed all the tenants at the Property that she would not be paying for water service after February 2013.[71] Tejeda further testified that she had hoped the tenants would have moved out of the Property by the time she stopped paying for water.[72] At trial, Tejeda could offer no plausible explanation for why this deposition testimony did not establish that Tejeda had stopped paying for water service for the purpose of inducing Velasquez and the other tenants to move.[73]

---

[67] Tr. at 33:19–34:10 (Velasquez's testimony).
[68] *Id.* (Velasquez's testimony). Tejeda testified that she informed Zulcic that she could not pay the water bill because of financial hardship. Tr. at 121:9–12. The Court finds Velasquez's version of the events at the Hearing to be more credible than Tejeda's.
[69] *Id.* at 123:15–124:4 (Tejeda's testimony).
[70] *Id.*
[71] November 23, 2016 Deposition of Wendy Tejeda at 68:23–69:5.
[72] *Id.* at 74:2–9.
[73] When asked at trial to explain her deposition testimony, Tejeda said that the reason she had hoped Velasquez and the other tenants would move was that the Property "seemed like an environment out of my norm" and was

That Tejeda's primary motive for ceasing to pay for water service was to induce the tenants to vacate the Property is further established by Velasquez's testimony:

> **Question (by Velasquez's counsel):** So when the water was shut off in 2014 did you call—you testified that you called Ms. Wendy [Tejeda] when the water was shut off, correct?
> **Answer:** Yes.
> **Question:** And that you [asked], "Why did you shut off the water"?
> **Answer:** Yes.
> **Question:** Did she tell you why?
> **Answer:** She would always say the same thing.
> **Question:** Which is?
> **Answer:** That she had called the people living there that she wanted everybody to leave, that she wanted all of us to leave because she had a lot of problems on that property ….

Tr. at 66:13–25.

The Court finds that Tejeda's motivation for wanting existing tenants to vacate the Property was her belief that it would be easier to sell the Property if it were vacant. The Court acknowledges that in most cases, an occupied rental property is easier to sell. However, here the evidence showed that certain tenants were hindering Tejeda's sale efforts. At her November 23, 2016 deposition (the "Nov. 2016 Deposition"), Tejeda testified that an attempt to sell the Property in 2013 had fallen through, in part because certain tenants refused to cooperate with the prospective purchaser's attempts to conduct an appraisal.[74]

In this regard, the Court notes that Tejeda tried, but failed, to evict two particularly trouble tenants, Elena and Ignacio Ruiz, through legal means. Tejeda had her father personally serve eviction paperwork upon Elena and Ignacio Ruiz because she was afraid of them.[75] Tejeda then commenced an unlawful detainer proceeding.[76] That proceeding was not successful in removing Elena and Ignacio Ruiz from the Property.[77] The Court finds that Tejeda, having been unsuccessful in her attempts to use legal process to remove tenants from the Property, then resorted to self-help by disconnecting the Property's various utility services—first the electrical service, then the gas service, and finally the water service.

After the Jan. 2015 Hearing, Tejeda did not attempt to restore water service to the Property. Tejeda testified that she personally visited GSWC to attempt to have water service restored, but that GSWC refused to restore water service unless Tejeda paid approximately $6,000 on account of the bill that had been accrued by the tenants.[78] According to Tejeda, GSWC's refusal to

---

"unsafe." Tr. at 190:20–25. In the Court's view, Tejeda's sudden apparent concern for the tenants' welfare was not genuine.

[74] Tejeda Nov. 23, 2016 Deposition at 58:16–59:17. The Court admitted the November 23, 2016 deposition of Tejeda in its entirety. At trial, Tejeda was not questioned regarding her deposition testimony that the 2013 sale of the Property had fallen through. Pursuant to Civil Rule 32(a), Velasquez is permitted to use any portion of Tejeda's deposition against her. Because the November 23, 2016 Tejeda deposition has been admitted in its entirety, the Court may consider even those portions of the deposition as to which Tejeda was not questioned.

[75] Tr. at 133:6–134:1 (Tejeda's testimony). The eviction paperwork was served sometime after August 2012. Tejeda did not testify as to the precise date upon which the paperwork was served. *Id.* at 133:2–134:18.

[76] *Id.* at 134:22–24 (Tejeda's testimony).

[77] *Id.* at 134:22–136:15 (Tejeda's testimony).

[78] *Id.* at 121:9–122:2 and 127:11–22 (Tejeda's testimony).

restore service absent payment was also based on the fact that tenants at the Property had tampered with the water meter.[79] Tejeda stated that she could not afford to pay the $6,000 bill.[80]

Tejeda's testimony is not credible. First, at the Nov. 2016 Deposition, Tejeda was asked whether she contacted GSWC after the Jan. 2015 Hearing, and was also asked whether she attempted to re-establish water service to the Property after the Jan. 2015 Hearing.[81] In response to both questions, Tejeda stated that she could not remember.[82] Had Tejeda personally visited GSWC in an attempt to restore water service to the Property, it is not plausible that Tejeda would not have remembered this information at her deposition but then remembered the information at trial.

Second, had GSWC demanded that Tejeda pay the $6,000 bill accrued by the tenants before reconnecting water service, it would have been acting in contravention of regulations promulgated by the California Public Utilities Commission. Here, the applicable regulation is Rule No. 11, ¶B.5 (emphasis added):

> When the utility has discovered that *a customer* has obtained service by fraudulent means, or has diverted the water service for unauthorized use, the service to that customer may be discontinued without notice. The utility will not restore service to *such customer* until that customer has complied with all filed rules and reasonable requirements of the utility and the utility has been reimbursed for the full amount of the service rendered and the actual cost to the utility incurred by reason of the fraudulent use.

The Court has been unable to locate any decisions, published or unpublished, interpreting this portion of Rule No. 11. Under the plain language of the rule, Tejeda could not have been barred from reconnecting water service to the Property based upon the fact that tenants at the Property had tampered with the water meter and had accrued a substantial unpaid bill. The rule permits a utility to refuse service to a customer who has obtained service by fraudulent means, if that customer fails to reimburse the utility for the costs of providing the services that were fraudulently obtained. Here, GSWC could have invoked Rule 11 to refuse restoration of service if one of the tenants who had fraudulently obtained water via tampering had attempted to reconnect service without paying the outstanding bill. But Rule 11 does not apply to Tejeda, who was not responsible for the tampering. The evidence is undisputed that Tejeda closed her account in February 2013, well before the tampering occurred.

The Court is aware that utilities companies do not always act in accordance with applicable regulations, especially in complicated situations such as that presented here, where application of the those regulations is not straightforward. However, given Tejeda's interest in establishing an excuse for not restoring water service, combined with the inconsistencies between her deposition testimony and her testimony at trial, the most plausible explanation is that Tejeda never attempted to restore water service by reopening an account in her name, not that GSWC refused to open an account in violation of the law. All the evidence before the Court shows that GSWC was extremely conservative in its interpretation and application of applicable regulations. GSWC

---

[79] *Id.* at 121:19–23 (Tejeda's testimony).
[80] *Id.* at 127:21–22 (Tejeda's testimony).
[81] At trial, Velasquez's counsel did not question Tejeda regarding the inconsistencies between her deposition and trial testimony with respect to Tejeda's efforts to restore water service in 2015. The Court may consider such testimony for the reasons set forth in footnote 58, above.
[82] Tejeda Nov. 23, 2016 Deposition at 84:12–20.

did not discontinue water service until the tenants had accrued an unpaid bill of $6,000 and had tampered with the water meter. GSWC's refusal to allow Velasquez to open a water account in her name did not violate applicable regulations; in cases of non-payment at a multi-tenant building, a utility provider may require that tenants receive water service only through the property owner or landlord's account.[83]

Tejeda's testimony regarding her claim that she attempted to reconnect water service in her name was short and cursory. She did not testify that GSWC informed her of her right to appeal its alleged refusal to reconnect service. Had GSWC refused service on the grounds claimed by Tejeda, it would have been required to apprise her of this right.[84] Tejeda did not supply any written documentation from GSWC establishing that she had attempted to reopen her account but had been refused. Had Tejeda actually attempted to open an account with GSWC in her name so that water service could be restored to the Property, the Court would have expected much more detailed and specific testimony regarding such an attempt.

Finally, Velasquez credibly testified that Tejeda told her that the water had been disconnected so that Velasquez would leave.[85] Velasquez further credibly testified that Tejeda told Velasquez, after the Jan. 2015 Hearing, that she should leave because social workers were coming to take away Velasquez's children.[86] Based on this testimony, the Court finds that Tejeda was attempting to strategically use disconnection of water service to the Property to coerce the existing tenants to move elsewhere. As discussed above, Tejeda's motivation for wanting existing tenants to vacate the Property was her belief that it would be easier to dispose of the Property if it were vacant.

Tejeda testified that the only reason she did not restore water service to the Property was because she could not afford to do so. This testimony is not credible. As discussed above, Tejeda's assertion that GSWC would not have opened a new water account for the Property in her name, unless she paid GSWC $6,000 on account of a past-due bill, is not plausible. Therefore, Tejeda would have only have been required to pay a reconnection charge of at most $40,[87] as well as monthly water charges, to restore service. The water account for the Property was in Tejeda's name from 2008 to February 2013.[88] Notwithstanding this fact, Tejeda claimed not to know the approximate monthly amount of the water bill.[89] At her November 2016 deposition, Tejeda estimated that the balance on the water bill was $400 when she closed the

---

[83] Regulations applicable to GSWC provide that in the event of non-payment, GSWC "may … require that service to subsequent tenants be furnished on the account of the landlord or property owner." *See* California Public Utility Commission Resolution W-4942, Order Approving GSWC's Request to Permit Payment of Water Bills Using A Credit or Debit Card; & Allowing GSWC's Request to Permit Customers to Receive Their Billing Statements Electronically., W-4942, 2013 WL 1465358 ("Resolution W-4942"), at *11.

[84] Rule 11, promulgated by the Public Utilities Commission, requires any utility refusing service to notify the applicant "promptly of the reason for the refusal of service and of the right of the applicant to appeal the utility's decision to the Public Utilities Commission." Rule 11 at ¶5.D.2, *available at* <http://docs.cpuc.ca.gov/published/Graphics/73831.PDF>.

[85] Tr. at 66:13–25 (Velasquez's testimony).

[86] *Id.* at 34:6–14 (Velasquez's testimony).

[87] *See* California Public Utilities Commission Sheet No. 7657-W, *available at* <http://www.gswater.com/wp-content/uploads/2017/04/1691-W-Approval-Rule-11-Updates-Schedule-FF.pdf>, at Rule 11, ¶C.1 (setting forth the reconnection charge that GSWC was permitted to charge as of April 10, 2017).

[88] Tr. at 154:10–11 (Tejeda's testimony).

[89] *Id.* at 154:13–15 (Tejeda's testimony).

account in February 2013.[90] Tejeda testified at trial that GSWC billed her monthly for water service at the Property.[91]

Based upon Tejeda's testimony at trial and at the Nov. 2016 Deposition, the Court finds that had Tejda re-established an account with GSWC, the monthly water bill would have been $400 at most. The Court finds that Tejeda could have afforded to pay this amount. Tejeda had been receiving $875 per month from Velasquez until water service at the Property was disconnected. Velasquez credibly testified that she would have resumed making monthly rental payments to Tejeda had the water service been reconnected.[92] Therefore, even if Velasquez had been the only tenant at the five-unit Property paying rent, Velasquez's rent would have been more than sufficient to cover the water bill.

As of December 2014, there was at least one other unit at the Property that the Court finds was most likely still generating rental income. That unit was occupied by Jessica Munoz and her husband. Tejeda claimed that Jessica Munoz stopped paying rent as of August 2012 because she was "in cahoots" with other tenants who were also not paying rent.[93] According to Tejeda, Munoz had learned from Velasquez and Elena Ruiz, another tenant, that Tejeda was experiencing financial hardship and was going through a divorce.[94] Tejeda asserted that Munoz decided to exploit Tejeda's difficult situation by ceasing to pay rent.[95]

Tejeda's explanation strains credulity. At her November 2016 deposition, Tejeda testified that she had a "good relationship" with Jessica Munoz as of 2012.[96] Tejeda's explanation that a tenant with whom she had a good relationship stopped paying rent, because she was "in cahoots" with other tenants in a scheme to exploit Tejeda's financial hardship and divorce, is not believable. Knowing that Tejeda was experiencing financial hardship would not cause a tenant to conclude that she could get away without paying rent. If anything, such knowledge would increase a tenant's incentive to pay rent, for fear that the landlord's desperation would make the commencement of unlawful detainer proceedings more likely.

*D. Tejeda's Conduct in Connection with the Disconnection of Tejeda's Water Service Constitutes "Willful and Malicious Injury" Within the Meaning of §523(a)(6)*

"Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and "malicious' requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). When determining intent, there is a presumption that the debtor knows the natural consequences of his actions. *Ormsby v. First Am. Title Co. of Nevada (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted).

---

[90] Tejeda Nov. 23, 2016 Deposition at 69:12–19.
[91] Tr. at 109:9–12 (Tejeda's testimony).
[92] *Id.* at 34:6–14 (Velasquez's testimony).
[93] *Id.* at 152:15–17 (Tejeda's testimony).
[94] *Id.* at 153:8–17 (Tejeda's testimony).
[95] *Id.*
[96] Tejeda Nov. 23, 2016 Deposition at 30:15–19.

"Within the plain meaning of this definition, it is the wrongful act that must be committed intentionally rather than the injury itself." *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005).

In addition, the injury-producing conduct must be tortious in order to be excepted from discharge under §523(a)(6). *Lockerby v. Sierra*, 535 F.3d 1038, 1040 (9th Cir. 2008). "[C]onduct is not tortious under § 523(a)(6) simply because injury is intended or 'substantially likely to occur,' but rather is only tortious if it constitutes a tort under state law." *Id.* at 1041.

Tejeda's disconnection of water service in February 2013, followed by her subsequent refusal to restore water service to the Property after December 2014, notwithstanding her financial ability to supply water to the Property, inflicted "willful and malicious injury" upon Velasquez within the meaning of §523(a)(6). As discussed above, Tejeda disconnected the water service, and subsequently refused to reconnect water service, for the purpose of inducing Velasquez and the other tenants to vacate the Property.

Velasquez had a month-to-month tenancy at the Property. Under California law, a month-to-month tenancy can be terminated only if the landlord provides the tenant written notice that complies with Cal. Civ. Proc. Code §§1161 *et seq. Culver Ctr. Partners E. #1, L.P. v. Baja Fresh Westlake Vill., Inc.*, 185 Cal. App. 4th 744, 749–50, 110 Cal. Rptr. 3d 833, 836–37 (2010). Tejeda never provided Velasquez any form of written notice terminating Velasquez's tenancy.[97]

Cal. Civ. Code §789.3(a) prohibits a landlord from terminating utility services for the purpose of terminating a tenancy:

> A landlord shall not with intent to terminate the occupancy under any lease or other tenancy or estate at will, however created, of property used by a tenant as his residence willfully cause, directly or indirectly, the interruption or termination of any utility service furnished the tenant, including, but not limited to, water, heat, light, electricity, gas, telephone, elevator, or refrigeration, whether or not the utility service is under the control of the landlord.

A landlord who violates the statute is liable for the tenant's actual damages, a fine of up to $100 per day, and the tenant's reasonable attorney's fees. Cal. Civ. Code §789.3(c).

Here, Tejeda violated Cal. Civ. Code §789.3 by terminating Velasquez's water service, and then subsequently refusing to reconnect Velasquez's water service, for the purpose of terminating Velasquez's tenancy. Tejeda's actions were "willful" within the meaning of §523(a)(6). Tejeda had a subjective intent to harm Velasquez by terminating her tenancy in an unlawful manner. At the very least, Tejeda was substantially certain that injury to Velasquez would occur. Tejeda's goal in terminating and then refusing to restore water service was to make living conditions at Velasquez's apartment so unpleasant that Velasquez would decide to move.

Tejeda's actions were also "malicious" within the meaning of §523(a)(6). Tejeda's attempt to unlawfully terminate Velasquez's tenancy was a wrongful act. As discussed above, the act was intentional. The act of depriving Velasquez of water necessarily caused injury. Finally, the act was done without just cause or excuse. As set forth above, Tejeda had the financial ability to continue to furnish water service to Velasquez's apartment.

Finally, Tejeda's actions were tortious under California law. In California, a landlord is required to maintain premises "in a lawful state of habitability," and the failure to do so is tortious. *Stoiber v. Honeychuck*, 101 Cal. App. 3d 903, 911, 162 Cal. Rptr. 194, 196 (Ct. App.

---

[97] Tr. at 123:3–6 (Tejeda's testimony).

1980). Cal. Civ. Code §1941.1 provides that a rental unit lacking a running water supply is uninhabitable. By purposefully failing to maintain Velasquez's apartment in a habitable condition, when she had the financial ability to do so, Tejeda tortiously violated her obligations under California law.

### E. *Velasquez's Damages*

Velasquez testified that she lived in the apartment without water from December 2014 "to the end of 2015."[98] Because Velasquez bears the burden of proof, the lack of specificity in her testimony must be resolved against her. The Court will calculate Velasquez's damages based on the assumption that Velasquez moved out of the apartment on October 1, 2015. Velasquez could not remember the exact date that water service was disconnected. She testified that she was without water throughout the entire Christmas holiday period of 2014.[99] Again resolving the lack of specificity against Velasquez, damages will be calculated based upon a disconnection date of December 25, 2014. For damages purposes, Velasquez was without water for 280 days.

Pursuant to Cal. Civ. Code §789.3(a), Velasquez is entitled to up to $100 per day for every day she was without water. The Court will impose the maximum penalty. Velasquez gave very emotional testimony regarding the deleterious effects that the absence of water had upon her. She was unable to prepare the home-cooked meals that her children preferred, and had to spend extra money on prepared food.[100] She and her children had to bathe at an acquaintance's home and pay to do so.[101] She had to purchase five gallon containers of water, and haul them up the stairs to her apartment, which was on the second floor.[102] She was forced to endure multiple inspections by DCFS, and was terrified that her children would be taken away.[103] The lack of water was frustrating to Velasquez's three children, and was especially disruptive to her youngest son, who suffers from autism.[104] Velasquez remained in the apartment, notwithstanding these difficult conditions, for an extended period of time because rising rental rates had priced her out of the market.[105] She was unable to move in with friends or family because her son's autism caused him to frequently become upset, hit people, and break things.[106] The absence of water damaged Velasquez in the amount of $28,000.00 ($100.00 per day times 280 days).

Cal. Civ. Code §789.3(a) provides for an award of attorneys' fees. However, Velasquez's counsel did not present any evidence establishing the amount of fees incurred. Therefore, the Court will not award any attorneys' fees.

---

[98] *Id.* at 46:11–14.
[99] *Id.* at 30:25–31:10 (Velasquez's testimony).
[100] *Id.* at 43:7–25.
[101] *Id.* at 42:19–43:6.
[102] *Id.* at 38:3–7.
[103] *Id.* at 44:20–46:10 and
[104] *Id.* at 39:24–42:7.
[105] *Id.* at 42:9–18.
[106] *Id.* at 40:19–41:21.

## V. Conclusion

Based upon the foregoing, Tejeda is indebted to Velasquez in the amount of $28,000.00. Such indebtedness is excepted from Tejeda's discharge pursuant to §523(a)(6). The Court will enter judgment consistent with this Memorandum of Decision.

###

Date: August 7, 2018

Ernest M. Robles
United States Bankruptcy Judge